**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| R2 Solutions LLC, | |
| Plaintiff, | Civil Action No. 3:22-cv-02869 |
| v. | Jury Trial Demanded |
| Southwest Airlines Co., | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff R2 Solutions LLC files this Complaint against Southwest Airlines Co. for infringement of U.S. Patent Nos. 8,341,157 ("the '157 patent"), 7,698,329 ("the '329 patent"), 8,209,317 ("the '317 patent"), 9,805,097 ("the '097 patent"), and 10,176,272 ("the '272 patent"). The '157 patent, '329 patent, '317 patent, '097 patent, and '272 patent are referred to collectively as the "patents-in-suit."

## THE PARTIES

1.      Plaintiff R2 Solutions LLC ("R2") is a Texas limited liability company located in Frisco, Texas.

2.      Defendant Southwest Airlines Co. ("Southwest") is a corporation with headquarters at 2702 Love Field Drive, #HDQ6TX, Dallas, Texas 75235.  Southwest may be served with process through its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## JURISDICTION AND VENUE

1.      This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et seq.*  This Court's jurisdiction over this action is proper under the above statutes, including 35 U.S.C. § 271, *et seq.*, 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1338 (jurisdiction over patent actions).

2.      This Court has personal jurisdiction over Southwest in accordance with due process and/or the Texas Long Arm Statute because, among other things, Southwest is a resident of Texas. Southwest also does business in this State by, among other things, "recruit[ing] Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state."  TEX. CIV. PRAC. & REM. CODE § 17.042(3).  For instance, Southwest has 79 job openings listed in Dallas, Texas as of December 14, 2022.[1]

3.      Relative to patent infringement, Southwest has committed and continues to commit acts in violation of 35 U.S.C. § 271, and has made, used, marketed, distributed, offered for sale, and/or sold infringing products and services in this State, including in this District, and otherwise engaged in infringing conduct within and directed at, or from, this District.  Such infringing products, systems, and/or services (collectively, the "Accused Instrumentalities") include systems, services, processes, methods, acts, components (hardware and/or software), and/or other instrumentalities associated with web-page widgets and/or searches or queries performed in connection with Southwest's web platform(s) and mobile application(s), including the products, systems, and/or services identified in Exhibits 6-10.  The "Accused Instrumentalities" include, without limitation, all systems, processes, and instrumentalities

---

[1] https://careers.southwestair.com/search-results?qcity=Dallas&qstate=Texas&qcountry=United%20States%20of%20America.

associated with receiving, handling, processing, responding to, or otherwise interacting with queries (including user queries and back-end queries); all systems, processes, and instrumentalities related to the location, identification, delivery, display, rendering, ranking, and communication of information relating to such queries; and all systems, processes, and instrumentalities associated with the delivery, display, rendering, and communication of information via Southwest's web platform(s) and mobile application(s), including those accessible at and/or through Southwest.com and Southwestvacations.com.  The "Accused Instrumentalities" include, without limitation, the front-end(s) and back-end(s) of Southwest's online travel agency and search engine services for hotels, vacation rentals, flights, and airport transfer incorporated into the Southwest web platform and/or Southwest mobile application.

4.      Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b) because Southwest has regular and established places of business in the District, at least at its headquarters in Dallas. Venue is further proper in this District because Southwest has infringed and/or induced the infringement of others, including its customers, in this District.

**BACKGROUND**

5.      The patents-in-suit were filed by Yahoo! Inc. ("Yahoo!") between 2006 and 2009. At the time, Yahoo! was a leading Internet communications, commerce, and media company. Yahoo! invested billions of dollars in research and development over this period, filing hundreds of patent applications each year to cover the innovative computing technologies emerging from its expansive research and development efforts.

6.      Yahoo! began as a directory of websites that two Stanford graduate students developed as a hobby.  The name "Yahoo" stands for "Yet Another Hierarchical Officious Oracle," a nod to how the original Yahoo! database was arranged hierarchically in layers of

3

subcategories.  From this initial database, Yahoo! would develop and promulgate numerous advancements in the field of data storage and recall.

7.      For example, in 1995, Yahoo! introduced Yahoo! Search.  This software allowed users to search the Yahoo! directory, making it the first popular online directory search engine. This positioned Yahoo! as the launching point for most users of the World Wide Web.  By 1998, Yahoo! had the largest audience of any website or online service.

8.      However, the early iterations of Yahoo! Search did not operate like a modern search engine because Yahoo! Search was only a directory.  Yahoo! Search first integrated a Web crawling engine in 2000.  Yahoo! Search used Google's Web crawling engine from 2000– 2004.  During this time, Yahoo! was developing its own Web search technologies.  Yahoo! deployed its own Web crawler in early 2004.  The engine, known as Slurp, allowed Yahoo! to collect documents from the Web and build a searchable index.  The patents-in-suit relate to innovations associated with Yahoo! Search that were developed and implemented during this period, which enabled Yahoo! to become Google's biggest competitor in the search engine space.

## THE PATENTS-IN-SUIT

9.      The '157 patent is entitled, "System and Method for Intent-Driven Search Result Presentation."  The '157 patent lawfully issued on December 25, 2012, and stems from U.S. Patent Application No. 12/533,299, which was filed on July 31, 2009.  A copy of the '157 patent is attached hereto as Ex. 1.

10.      The '329 patent is entitled, "Method for Improving Quality of Search Results by Avoiding Indexing Sections of Pages."  The '329 patent lawfully issued on April 13, 2010, and

stems from U.S. Patent Application No. 11/652,356, which was filed on January 10, 2007.  A copy of the '329 patent is attached hereto as Ex. 2.

11.     The '317 patent is entitled, "Method and Apparatus for Reconstructing a Search Query."  The '317 patent lawfully issued on June 26, 2012, and stems from U.S. Patent Application No. 13/270,933 filed on October 11, 2011.  The '317 patent is a continuation of U.S. Patent Application No. 12/765,676 filed on April 22, 2010, which is a continuation of U.S. Patent Application No. 11/502,202 filed on August 10, 2006.  A copy of the '317 patent is attached hereto as Ex. 3.

12.     The '097 patent is entitled, "Method and System for Providing a Search Result." The '097 patent lawfully issued on October 31, 2017, and stems from PCT Application No. PCT/CN2014/094122, which was filed on December 17, 2014.  A copy of the '097 patent is attached hereto as Ex. 4.

13.     The '272 patent is entitled, "System and Method of Automatically Sizing and Adapting a Widget to Available Space."  The '272 patent lawfully issued on January 8, 2019, and stems from U.S. Patent Application No. 11/864,589, which was filed on September 28, 2007.  A copy of the '272 patent is attached hereto as Ex. 5.

14.     R2 Solutions is the owner of the patents-in-suit with all substantial rights, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

15.     The claims of the patents-in-suit are directed to patent eligible subject matter under 35 U.S.C. § 101.  They are not directed to abstract ideas, and the technologies covered by the claims consist of ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

16.     Indeed, the specifications of the patents-in-suit disclose shortcomings in the prior art and then explain, in detail, the technical way the claimed inventions resolve or overcome those shortcomings.  For example, relative to the '157 patent, the specification explains that if, as in the case of traditional search engines, the "engine simply regards a web query as, for example, a 'bag of words', the search engine will search for web pages and other data objects (e.g., images, audio files, text files) that contain, or are otherwise associated with, the individual words within the query."  '157 patent at 4:1-5.  However, simply treating a user query as a "bag of words" may yield results that do not align with the purpose of the user's search.  Additionally, it can be onerous to scrutinize generated results for a desired returned object, as the objects can be unremarkable as to each other.  *Id*. at 4:10-15.  Thus, the specification teaches:

> Search results could be significantly enhanced if the likely intent of the query is known. For example, search results may be ranked such that results that are more relevant to the user's intent appear at or near the top of the search results. Perhaps more significantly, however, the user's intent can be used to customize the display and behavior of a search result to be narrowly targeted to a user's intent. An illustrative list of such customizations could include a customized title or abstract for the result or specialized parameters of a displayed clickable URL to provide the landing page with information regarding the user's intent or triggered by the user's intent.

*Id.* at 4:16-26.

17.     This "intents"-driven search engine process offers significant technical features that constitute enhancements over then-existing search engine technology.  For example, the '157 patent discusses how pre-programmed "intents" can be mapped to from query keywords, and how "intents" determination can be fine-tuned via particular parameters:

> The query is then classified into one or more likely intents, which can include an unclassified intent when no defined intents match the query 2300. An intent is a

mapping from many combinations of keywords to a relatively small set of
common goals that users pursue in a search query or session of multiple queries.
Often, the intent of the query is not explicitly stated in the keywords. While the
space of possible queries, is very large, the set of intents is much smaller.
Examples of intents relating to product queries can be, for example: official-site,
research, purchase, dealer, support, or reviews. Examples of intents relating to
local/map queries: directions, reviews, phone, hours-of-operation. In one
embodiment, query intent may be determined by linguistic analysis of query
keywords. In one embodiment, previous queries in the user session, user profile
information such as preferences, the set of all queries from all users or any subset
of all users (e.g. a subset of users having specific demographics or usage
patterns), and click data from previous sessions for the current user as well as the
set of all users or any subset of all users are used to determine query intent.

'157 patent at 9:42-61.

18.     The "intents"-driven search engine process of the '157 patent ensures that query

keywords, via the "intents," can even ultimately impact how particular data objects are

constructed within a result.  This provides an added benefit of enabling keywords to be utilized

for more than just relevancy analysis.  Also, while other search engines existing at the time could

tailor search results by ranking the results and displaying each result with a title and brief

abstract taken from the document, the '157 patent explains how "results could be significantly

enhanced if the likely intent of the query is known."  '157 patent at 4:16-17.  Rather than return

all documents having a matching keyword—i.e., by using traditional indexing methods—a

narrower set of results can be returned if the search results are "ranked such that results that are

more relevant to the user's intent appear at or near the top of the search results."  *Id.* at 4:17-19.

19.     Indeed, the claims of the '157 patent provide just such a solution to the problem

of generating robust yet usable search results in response to a user query.  For example, Claim 1

of the '157 patent discloses a method comprising:

7

receiving, over a network, a query from a user, the query comprising at least one query token;

analyzing the query, using at least one computing device, to ***identify at least one query keyword***;

determining, at least the one computing device, ***a plurality of intents from the at least one keyword, each of the plurality of intents indicates a type of information regarding the query keyword that is likely to be desired by a user submitting the query***;

classifying the query, using the at least one computing device, ***into at least one of the plurality of intents***;

identifying, using the at least one computing device, a plurality of data objects available over the network that match the at least one query keyword;

assigning, using the at least one computing device, ***at least one of the plurality of intents to at least some of the plurality of data objects***;

ranking, using the at least one computing device, the plurality of data objects;

building a result, using the at least one computing device, using the ranked plurality of data objects, the result comprises a plurality of display entries, ***at least one display entry customized to a respective assigned intent is constructed for each of the ranked plurality of data objects***; and

transmitting the result, over the network, to the user.

(emphasis added).

20.     These technical features highlight that Claim 1 itself outlines a novel process executed by a specialized programming architecture that constitutes a significant improvement in computer functionality.  Each of the technical features emphasized above operates cooperatively to enhance the technological process of search engine application, and these advances define a novel improvement in computer capabilities.

21.     Thus, the inventions claimed in the '157 patent improve the speed, efficiency, effectiveness, and functionality of computer systems rather than improve upon some other task

for which a computer is used in its ordinary capacity.  For example, the '157 patent focuses on circumventing the "bag of words" approach in result generation, and ultimately achieves better, more-usable computer-generated results as compared to technologies that existed in 2009.  As another example, the '157 patent can rank documents based on intent rather than using "a traditional {query,document} score," increasing the probability that a relevant result will be in the final result set presented to the user.  '157 patent at 12:7-22.  This reduces the number of queries that must be processed in order to return relevant results to the user.  As a result, the processor is free to allocate more resources to other tasks.

22.     With respect to the '329 patent, the specification explains that nefarious parties can trick traditional search engines "into recalling documents and inflating their ranking" using techniques known as "search engine spamming."  '329 patent at 2:6-8.  For example, spamming may be used to "trick search engine ranking algorithms into recalling and highly ranking documents that contain . . . sponsored links to a web merchant."  *Id.* at 2:8-11.  The result is that search results for many queries include irrelevant content that the querier did not desire.  *Id.* at 2:14-17.  The specification gives a specific example of an online shopper:

> A typical example of search engine spam is when a user tries to search for the terms "digital camera reviews" and expects to find pages which review various models of digital cameras, detailing performance specifications, sample images and reviewer pros and cons list. Having this expectation when the user clicks on a link for one of the results, the user is instead led to a page that contains nothing but a plethora of keywords and links to other stores where he can buy the camera.

*Id.* at 2:18-27.  Thus, the specification recognizes that "there is need for mechanisms that prevent hiding of search engine spam but yet allow webmasters to designate page content that should not be indexed."  *Id.* at 2:34-37.

23.     The specification describes a novel approach to achieve this goal:

> As a crawler examines an individual document, one of the attributes that can be considered is section structure. In examining the various sections, the crawler identifies sections to ignore, that is, to not index in search engine indexes and or otherwise use for recalling the document. Such sections are referred to herein as "no-recall sections." Those portions that are indexed for recalling are referred to as recall sections. In an embodiment, a crawler ignores no-recall sections demarcated by, for example, a tag. In another embodiment a no-recall section may be identified by analyzing section content rather than examining only delimiters. The terms inside no-recall sections do not contribute to the document term frequency counts and are not used for recalling the documents in response to search engine queries. However the no-recall sections are included as input to forms of analysis of the document that affect, for example, the document's ranking. Links inside the no-recall sections as well as the rest of the document may be followed in order to discover new content. The document may be analyzed for the amount of advertisements or other features in its entirety. Therefore, terms inside the no-recall sections can affect document ranking.

*Id.* at 3:7-27.  This approach solves the problem described in the specification by simultaneously enabling ranking that is not dictated by relevance scores and preventing nefarious parties from hiding search engine spam, e.g., because pages with "copious amounts of advertisements, or low quality links, will be readily identified and ranked accordingly."  *Id.* at 3:28-31.

    24.    Claim 1 of the '329 patent embodies this solution:

A method, comprising:

ranking a plurality of documents recalled by a search engine for a query;

wherein the plurality of documents contain certain documents, ***each document of said certain documents containing at least one section that is not used by said search engine for recall*** and one or more sections that are used by said search engine for recall;

> *wherein ranking* a plurality of documents includes ranking said plurality of
>> documents *based, at least in part, on the at least one section of said certain*
>> *documents not used by said search engine to recall documents*; and;
>
> wherein the method is performed by one or more computing devices.

(emphasis added).

25.     Claim 1 communicates two overarching technological improvements: 1) an improved data structure that is capable of facilitating both search engine recall and improved ranking via the attributes of recall and no-recall sections; and 2) an improved ranking process rooted in a specialized computing device and/or software capable of delineating between and selectively employing recall and no-recall sections found in a plurality of the aforementioned improved data structures.  These two technological advancements, working in tandem, realize a discrete process and/or system that greatly improves upon search engine technology that existed in 2007.

26.     The claimed method of search engine architecture improves navigation of the World Wide Web by increasing the relevance of search results and thwarting nefarious Web users seeking to game Web query rankings.  S*ee, e.g.*, '329 patent at 1:67 - 2:17.  By improving the functionality of navigating the Web, the claimed invention is necessarily rooted in the improvement of computer functionality, as opposed to, e.g., enhancing the economy of a task usually performed by hand.  For example, by not ignoring no-recall sections when ranking the documents, the claimed invention prevents a document from being "designed so that content that increases recall and/or ranking potential is placed in the recall section and content that diminishes high ranking potential is hidden in a no-recall section."  '329 patent at 4:1-9.  This allows "[a]ll the attributes in all of the sections of a document such as 'links', frequency of terms, coloring, font, etc." to be considered in the spam and relevancy analyses.  *Id.* at 4:13-16.

The result is that a search engine can "affect the recall and ranking of documents to more accurately reflect relevance of the documents to search engine queries." *Id.* at 3:1-3. This technological solution is the precise reason that the '329 patent was allowed, as is apparent from the prosecution history.

27.     Relative to the '317 patent, the specification explains that existing search engine interfaces "may be rigid and require users to submit full queries to perform searche[s]." '317 patent at Abstract. Traditional search engines were built with desktop computer users in mind. Thus, they were designed with the assumption that a user had access to a full keyboard for composing a complete, properly structured search query. However, as noted in the specification of the '317 patent, users at the time could increasingly access the internet from a variety of devices, including "cell phones, personal digital assistants, and the like." *Id.* at 1:44-47. Portability started to become "an increasingly important concern for users." *Id.* at 1:50-52. The increasing portability of these devices came with a tradeoff in input capabilities. *See id.* at 1:50-52. For example, most phones at the time the '317 patent was filed did not have a full keyboard. The simpler input mechanisms available on mobile devices presented a barrier to entering properly structured queries, thus limiting users' ability to fully explore the Internet. *See id.* at 1:52-53.

28.     To solve these problems, the '317 patent discloses "a flexible and intuitive system for reconstructing a search query based on a received partial query." *Id.* at 1:16-18. This solution is embodied in Claim 1 of the '317 patent:

A computer database system for providing search results to a user in response to user submissions over a data network, the computer database system comprising:
a database configured to store information about events in the computer database system; and

a query reconstruction server in data communication with the database and operative
to receive a partial query submitted at a remote user client system by a user
seeking search results matching the submitted partial query and, ***in response to
the received partial query, determine a full query*** based on

(i)      the received partial query, and

(ii)     information stored in the database about queries previously-submitted by
users,

wherein the submitted partial query comprises an abbreviated or incomplete search
query which is not fully representative of an entire search query desired by the
user and the full query is better representative of the entire search query desired
by the user.

(emphasis added).

29.     The specification explains that partial queries are "shorthand ways of expressing typical search queries." *Id.* at 3:15-17. For example, "auto ins" may be a partial query for the full search query "auto insurance." *Id.* at 3:20-23. While "auto ins" may be an intentional abbreviation, it might also be a typographical error resulting from the restrictive input options of a mobile device. Because the claimed invention will nevertheless be able to take the incomplete query "auto ins" and return search results for "auto insurance," a broader array of mobile devices and input mechanisms may be used to search the Internet. *See id.* at 1:43-56.

30.     With respect to the '097 patent, the specification addresses disadvantages in prior art approaches to searching algorithms and renderings. For example, the '097 patent explains that "[c]onventional approaches for providing a search result focus on presenting the items in the search result as a list. For example, a conventional search result includes items listed from top to bottom on a screen. This can limit user engagement on the search result as the user may lose interest after viewing the top two items." '097 patent at 1:30-35. "It is [also] time consuming

for the user to scroll up and down to find an interesting item with a listed presentation...." *Id*. at 1:35-40.

31.     As a solution to this drawback, the '097 patent enables, in response to a search query, the displaying of content items in a framed structure (e.g., displaying thumbnails of the video content in some framed structure), as opposed to a list of search results going from top to bottom, where there is a correspondence between one or more content items and at least one sub-component.  The solution is embodied in Claim 1 of the '097 patent:

> A method, implemented on at least one computing device each of which has at
>     least one processor, storage, and a communication platform connected to a
>     network for providing a search result, the method comprising:
> receiving a search request from a user;
> determining a plurality of content items based on the search request;
> selecting one or more content items from the plurality of content items;
> ***generating a framed structure having at least one sub-component***;
> ***determining a correspondence between the one or more content items and the at***
>     ***least one sub-component***;
> ***arranging each of the one or more content items with respect to a***
>     ***corresponding sub-component***;
> generating a search result based on the one or more content items and the framed
>     structure; and
> providing the search result.

(emphasis added).

32.     The inventions described and claimed in the '097 patent improve the speed, efficiency, effectiveness, and functionality of computer systems.  Moreover, the inventions provide an improvement in computer functionality beyond rote tasks for which a computer is used in its ordinary capacity.  For example, the '097 patent enhances "search result generation and presentation, realized as a specialized and networked system by utilizing one or more

14

computing devices (e.g., mobile phone, personal computer, etc.) and network communications (wired or wireless)." *Id*. at 4:29-33. The '097 patent provides significant advantages over prior art by "providing a search result to a user to improve the user engagement and/or increase revenue for a search engine. After submitting a query to a search engine, a user may receive a search result including one or more content items. The user's interest on the items may be stimulated not only by their content but also by a manner of providing or presenting them." *Id*. at 4:33-40.

33.     Relative to the '272 patent, the specification explains that with respect to web-page widgets, "[e]ven though multiple sizes are offered, their limited number cannot account for all web-page sizing variations; not only do web pages come in a wide number of styles and designs, but an end user ultimately has control, to a greater or lesser relative extent, over the monitor size and the web browser dimensions; if the web page is designed using mostly relative constraints, then the size of the web page can vary widely depending on monitor size, browser-window size, etc." '272 patent at 1:40-48. The specification further explains that "changing the size of a widget is often a frustrating experience," especially with respect to incorporating the widget into a webpage, which can require a user to "repeat the entire settings-choosing process, including placing the widget code on the web page." *Id*. at 48-51. Thus, "[i]n light of the immutable nature of current widgets, it is often the case that they do not or cannot fit into an already-established web page layout," meaning that a widget will often "overflow[] out of its section," "not appear[] at all," or cause other errors, such as pushing other sections "down and out of view" or causing other sections to be "resized to fit [the] widget." *Id*. at 2:38-52.

34.     To address these failings in the art, the '272 patent discloses an enhanced widget technology that realizes the "general object of…automatically siz[ing] a web-based widget

relative to its real-time constraints to make optimal and efficient use of available space." *Id*. at 1:57-60. This solution is embodied in, e.g., claim 1 of the '272 patent:

> A method comprising:
>
> ***receiving structural data associated with a web page***, the web page including a widget, the widget including a plurality of widget elements, wherein the structural data includes a size of a browser window used to display the web page;
>
> ***accessing a constraint regarding a pre-determined number of the widget elements*** to display within the widget;
>
> ***triggering during a display of the browser window and the plurality of widget elements a reduction in a size of the widget and a reduction in a plurality of sizes of the widget elements*** to display within the widget when the size of the browser window reduces;
>
> ***removing one or more of the widget elements from being displayed within the widget*** after reducing the sizes of the widget elements, wherein said removing the one or more of the widget elements is performed ***until the constraint is achieved***;
>
> ***increasing a size of remaining one of the widget elements of the reduced size to fit within the widget*** of the reduced size upon achieving the constraint; and
>
> sending data for displaying the widget.

(emphasis added).

35.     The claimed inventions of the '272 patent detail an enhanced widget technology that implements technological features like those emphasized above to improve upon computer functionality—indeed, the patent focuses on technology that can only exist in the realm of computers, e.g., widgets. Moreover, the inventions provide an improvement in computer functionality beyond rote tasks for which a computer is used in its ordinary capacity, and the inventions described and claimed in the '272 patent improve the speed, efficiency, effectiveness, and functionality of computer systems.  For example, the '272 patent enhances widget technology by enabling a "widget [] to resize itself automatically relative to where it is being

placed," and further provides a widget that can "determine[], based on its available space…the elements it should display and at what size." *Id*. at 2:66 – 3:1, 3:10-15. The '272 patent realizes significant advantages over prior art by providing "web-based widgets" capable of making "optimal and efficient use of their bounded space." *Id*. at 2:19-20.

36.     In essence, each of the patents-in-suit relate to novel and non-obvious inventions in the fields of search engines, data analytics, and database structures.

## DEFENDANT'S PRE-SUIT KNOWLEDGE OF ITS INFRINGEMENT

37.     Prior to the filing of this Complaint, Southwest was notified on numerous occasions of the R2 portfolio to which the patents-in-suit belong, and R2 has further attempted to engage Southwest in licensing discussions related to the patents-in-suit for over a year.

38.     On June 1, 2021, Craig Yudell, President of R2, sent a letter to Mark Shaw, Southwest's Executive Vice President and Regulatory Officer, offering an opportunity to negotiate a broad license to the portfolio that includes the patents-in-suit. The letter explained that R2's portfolio originated from Yahoo! and that it includes patents covering a variety of technologies relevant to Southwest.

39.     On September 28, 2021, Mr. Yudell sent Mr. Shaw another letter restating the information from the June 1 letter and, again, offering an opportunity to open negotiations. The September 28 letter further explained that since the June 1 letter, R2 had licensed many companies through negotiated deals and had also resolved several lawsuits involving patents at issue here.

40.     On October 12, 2021, Evan Woolley, VP of Licensing for R2's owner, sent Mr. Shaw yet another letter. The letter reiterated that R2 had resolved certain litigation, demonstrating the value of R2's portfolio to Southwest.

41.     Mr. Woolley continued his attempts to engage Southwest in negotiations with another letter to Mr. Shaw on January 12, 2022, identifying other litigation that had been resolved.

42.     Southwest ignored each and every one of these attempts to open a licensing dialogue.  As a result, R2 was left with no other choice but to file suit.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 8,341,157

43.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

44.     R2 is the owner of the '157 patent with all substantial rights to the '157 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

45.     The '157 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

***Direct Infringement (35 U.S.C. § 271(a))***

46.     Southwest has directly infringed and continues to directly infringe one or more claims of the '157 patent in this District and elsewhere in Texas and the United States.

47.     To this end, Southwest has infringed and continues to infringe, either by itself or via an agent, at least claims 1-5 and 7-10 of the '157 patent by, among other things, making, offering to sell, selling, testing and/or using the Accused Instrumentalities.

48.     Attached hereto as Ex. 6, and incorporated herein by reference, is a representative claim chart detailing how Southwest infringes the '157 patent.

49.     Southwest is liable for its infringements of the '157 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

50.     In addition and/or in the alternative to its direct infringement, Southwest has indirectly infringed and continues to indirectly infringe one or more claims of the '157 patent by inducing direct infringement by its customers and end users.

51.     Southwest has had knowledge of the '157 patent since as early as September 28, 2021, when Mr. Yudell informed Southwest that R2 resolved a lawsuit against Workday, which involved the '157 patent. At a minimum, Southwest has had knowledge of the '157 patent since being served with this Complaint.

52.     Despite having knowledge (or being willfully blind to the fact) that use of the Accused Instrumentalities infringes the '157 patent, Southwest has specifically intended, and continues to specifically intend, for persons (such as Southwest's customers and end users) to access, exercise control over, benefit from, use, and/or otherwise interact with the Accused Instrumentalities in ways that infringe the '157 patent, including at least claim 2.  Indeed, Southwest knew or should have known that its actions have induced, and continue to induce, such infringements.

53.     Southwest instructs and encourages customers and end users to use the Accused Instrumentalities in ways that infringe the '157 patent.  For example, the Southwest website prominently displays a search interface instructing users to "Book" travel and/or input origin, destination, etc., to induce users to search for flights and/or vacation packages:



https://www.southwest.com/.



https://www.southwestvacations.com/#!/.

54.     Southwest further provides users of the Southwest website with instructions and operation tips that include instructions and links directing users to applications on the Southwest website implementing search functionality in a way that infringes the '157 patent:



https://www.southwest.com/help/booking/how-to-book-and-manage-flight.

21

*Damages*

55.    R2 has been damaged as a result of Southwest's infringing conduct described in this Count. Southwest is, thus, liable to R2 in an amount that adequately compensates it for Southwest's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 7,698,329**

56.    This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

57.    R2 is the owner of the '329 patent with all substantial rights to the '329 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

58.    The '329 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

59.    Southwest has directly infringed and continues to directly infringe one or more claims of the '329 patent in this District and elsewhere in Texas and the United States.

60.    To this end, Southwest has infringed and continues to infringe, either by itself or via an agent, at least claims 1, 4-5, 8, and 11-12 of the '329 patent by, among other things, making, offering to sell, selling, testing and/or using the Accused Instrumentalities.

61.    Attached hereto as Ex. 7, and incorporated herein by reference, is a representative claim chart detailing how Southwest infringes the '329 patent.

62.    Southwest is liable for its infringements of the '329 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

63.    In addition and/or in the alternative to its direct infringement, Southwest has indirectly infringed and continues to indirectly infringe one or more claims of the '329 patent by inducing direct infringement by its customers and end users.

64.    Southwest has had knowledge of the '329 patent since as early as January 12, 2022, when Mr. Woolley informed Southwest that R2 resolved a lawsuit against Target, which involved the '329 patent. At a minimum, Southwest has had knowledge of the '329 patent since being served with this Complaint.

65.    Despite having knowledge (or being willfully blind to the fact) that use of the Accused Instrumentalities infringes the '329 patent, Southwest has specifically intended, and continues to specifically intend, for persons (such as Southwest's customers and end users) to access, exercise control over, benefit from, use, and/or otherwise interact with the Accused Instrumentalities in ways that infringe the '329 patent, including at least claims 8, 11, and 12. Indeed, Southwest knew or should have known that its actions have induced, and continue to induce, such infringements.

66.    Southwest instructs and encourages customers and end users to use the Accused Instrumentalities in a manner than infringes the '329 patent.  For example, the Southwest website prominently displays a search interface instructing users to "Book" travel and/or input origin, destination, etc., to induce users to search for flights and/or vacation packages:



https://www.southwest.com/.



https://www.southwestvacations.com/#!/.

67.    Southwest further provides users of the Southwest website with instructions and operation tips that include instructions and links directing users to applications on the Southwest website implementing search functionality in a way that infringes the '329 patent:



https://www.southwest.com/help/booking/how-to-book-and-manage-flight.

*Damages*

68.     R2 has been damaged as a result of Southwest's infringing conduct described in this Count. Southwest is, thus, liable to R2 in an amount that adequately compensates it for Southwest's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT III**
**INFRINGEMENT OF U.S. PATENT NO. 8,209,317**

69.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

70.     R2 is the owner of the '317 patent with all substantial rights to the '317 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

71.     The '317 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

72.     Southwest has directly infringed and continues to directly infringe one or more claims of the '317 patent in this District and elsewhere in Texas and the United States.

73.     To this end, Southwest has infringed and continues to infringe, either by itself or via an agent, at least claims 1-2, 8-10, and 12 of the '317 patent by, among other things, making, offering to sell, selling, testing and/or using the Accused Instrumentalities.

74.     Attached hereto as Ex. 8, and incorporated herein by reference, is a representative claim chart detailing how Southwest infringes the '317 patent.

75.     Southwest is liable for its infringements of the '317 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

76.     In addition and/or in the alternative to its direct infringement, Southwest has indirectly infringed and continues to indirectly infringe one or more claims of the '317 patent by inducing direct infringement by its customers and end users.

77.     Southwest has had knowledge of the '317 patent since as early as September 28, 2021, when Mr. Yudell informed Southwest that R2 resolved a lawsuit against Samsung, which involved the '317 patent. At a minimum, Southwest has had knowledge of the '317 patent since being served with this Complaint.

78.     Despite having knowledge (or being willfully blind to the fact) that use of the Accused Instrumentalities infringes the '317 patent, Southwest has specifically intended, and continues to specifically intend, for persons (such as Southwest's customers and end users) to access, exercise control over, benefit from, use, and/or otherwise interact with the Accused Instrumentalities in ways that infringe the '317 patent, including at least claim 1.  Indeed, Southwest knew or should have known that its actions have induced, and continue to induce, such infringements.

79.     Southwest instructs and encourages customers and end users to use the Accused Instrumentalities in ways that infringe the '317 patent.  For example, the Southwest website prominently displays a search interface instructing users to "Book" travel and/or input origin, destination, etc., to induce users to search for flights and/or vacation packages:



https://www.southwest.com/.



https://www.southwestvacations.com/#!/.

80.     Southwest further provides users of the Southwest website with instructions and operation tips that include instructions and links directing users to applications on the Southwest website implementing search functionality in a way that infringes the '317 patent:



https://www.southwest.com/help/booking/how-to-book-and-manage-flight.

*Damages*

81.     R2 has been damaged as a result of Southwest's infringing conduct described in this Count. Southwest is, thus, liable to R2 in an amount that adequately compensates it for Southwest's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

**COUNT IV**
**INFRINGEMENT OF U.S. PATENT NO. 9,805,097**

82.     This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

83.     R2 Solutions is the owner of the '097 patent with all substantial rights to the '097 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

84.     The '097 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

85.     Southwest has directly infringed and continues to directly infringe one or more claims of the '097 patent in this District and elsewhere in Texas and the United States.

86.     To this end, Southwest has infringed and continues to infringe, either by itself or via an agent, at least claims 1, 3, 8-10, and 17-20 of the '097 patent by, among other things, making, offering to sell, selling, testing and/or using the Accused Instrumentalities.

87.     Attached hereto as Ex. 9, and incorporated herein by reference, is a representative claim chart detailing how Southwest infringes the '097 patent.

88.     Southwest is liable for its infringements of the '097 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

89.     In addition and/or in the alternative to its direct infringement, Southwest has indirectly infringed and continues to indirectly infringe one or more claims of the '097 patent by inducing direct infringement by its customers and end users.

90.     Southwest has had knowledge of the '097 patent at least since being served with this Complaint.

91.     Despite having knowledge (or being willfully blind to the fact) that use of the Accused Instrumentalities infringes the '097 patent, Southwest has specifically intended, and continues to specifically intend, for persons (such as Southwest's customers and end users) to access, exercise control over, benefit from, use, and/or otherwise interact with the Accused Instrumentalities in ways that infringe the '097 patent, including at least claim 1.  Indeed, Southwest knew or should have known that its actions have induced, and continue to induce, such infringements.

92.     Southwest instructs and encourages customers and end users to use the Accused Instrumentalities in ways that infringe the '097 patent.  For example, the Southwest website prominently displays a search interface instructing users to "Book" travel and/or input origin, destination, etc., to induce users to search for flights and/or vacation packages:



https://www.southwest.com/.



https://www.southwestvacations.com/#!/.

93.      Southwest further provides users of the Southwest website with instructions and operation tips that include instructions and links directing users to applications on the Southwest website implementing search functionality in a way that infringes the '097 patent:



https://www.southwest.com/help/booking/how-to-book-and-manage-flight.

*Damages*

94.      R2 Solutions has been damaged as a result of Southwest's infringing conduct described in this Count. Southwest is, thus, liable to R2 Solutions in an amount that adequately compensates it for Southwest's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT V
## INFRINGEMENT OF U.S. PATENT NO. 10,176,272

95.      This cause of action arises under the patent laws of the United States, and in particular, 35 U.S.C. §§ 271, *et seq*.

96.      R2 Solutions is the owner of the '272 patent with all substantial rights to the '272 patent, including the exclusive right to enforce, sue, and recover damages for past and future infringements.

97.      The '272 patent is valid and enforceable and was duly issued in full compliance with Title 35 of the United States Code.

*Direct Infringement (35 U.S.C. § 271(a))*

98.      Southwest has directly infringed and continues to directly infringe one or more claims of the '272 patent in this District and elsewhere in Texas and the United States.

99.      To this end, Southwest has infringed and continues to infringe, either by itself or via an agent, at least claims 1 and 10 of the '272 patent by, among other things, making, offering to sell, selling, testing and/or using the Accused Instrumentalities.

100.      Attached hereto as Ex. 10, and incorporated herein by reference, is a representative claim chart detailing how Southwest infringes the '272 patent.

101.      Southwest is liable for its infringements of the '272 patent pursuant to 35 U.S.C. § 271.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

102.    In addition and/or in the alternative to its direct infringement, Southwest has indirectly infringed and continues to indirectly infringe one or more claims of the '272 patent by inducing direct infringement by its customers and end users.

103.    Southwest has had knowledge of the '272 patent at least since being served with this Complaint.

104.    Despite having knowledge (or being willfully blind to the fact) that use of the Accused Instrumentalities infringes the '272 patent, Southwest has specifically intended, and continues to specifically intend, for persons (such as Southwest's customers and end users) to access, exercise control over, benefit from, use, and/or otherwise interact with the Accused Instrumentalities in ways that infringe the '272 patent, including at least claims 1 and 10. Indeed, Southwest knew or should have known that its actions have induced, and continue to induce, such infringements.

105.    Southwest instructs and encourages customers and end users to use the Accused Instrumentalities in ways that infringe the '272 patent.  For example, Southwest's website prominently displays interactive widget interfaces that instruct users to "Book" travel and/or input origin, destination, etc., to induce users to interact with the interactive widget interfaces:



https://www.southwest.com/.



https://www.southwestvacations.com/#!/.

106.    Southwest further provides users of the Southwest website with instructions and operation tips that include instructions and links directing users to applications on the Southwest website implementing interactive widget interfaces in a way that infringes the '272 patent:



https://www.southwest.com/help/booking/how-to-book-and-manage-flight.

37

*Damages*

107.    R2 Solutions has been damaged as a result of Southwest's infringing conduct described in this Count. Southwest is, thus, liable to R2 Solutions in an amount that adequately compensates it for Southwest's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## DEMAND FOR A JURY TRIAL

R2 demands a trial by jury on all issues triable of right by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

R2 respectfully requests that this Court enter judgment in its favor and grant the following relief:

(i)     Judgment and Order that Southwest has directly and/or indirectly infringed one or more claims of each of the patents-in-suit;

(ii)    Judgment and Order that Southwest must pay R2 past and future damages under 35 U.S.C. § 284, including supplemental damages arising from any continuing, post-verdict infringement for the time between trial and entry of the final judgment, together with an accounting, as needed, as provided under 35 U.S.C. § 284;

(iii)   Judgment and Order that Southwest must pay R2 reasonable ongoing royalties on a go-forward basis after Final Judgment;

(iv)    Judgment and Order that Southwest must pay R2 pre-judgment and post-judgment interest on the damages award;

(v)     Judgment and Order that Southwest must pay R2's costs;

(vi)     Judgment and Order that the Court find this case exceptional under the provisions

of 35 U.S.C. § 285 and accordingly order Southwest to pay R2's attorneys' fees;

and

(vii)    Such other and further relief as the Court may deem just and proper.

Dated: December 21, 2022                        Respectfully submitted,


_/s/ Edward R. Nelson III_
EDWARD R. NELSON III
State Bar No. 00797142
ed@nelbum.com
BRENT N. BUMGARDNER
State Bar No. 00795272
brent@nelbum.com
CHRISTOPHER G. GRANAGHAN
State Bar No. 24078585
chris@nelbum.com
JOHN P. MURPHY
State Bar No. 24056024
murphy@nelbum.com
CARDER W. BROOKS
State Bar No. 24105536
carder@nelbum.com
**NELSON BUMGARDNER CONROY PC**
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
817.377.9111

**COUNSEL FOR PLAINTIFF
R2 SOLUTIONS LLC**